GEORGE W. WARNECKE, Respondent, *v.* COUNTRYWIDE REALTY, INC., Appellant.

First Department, December 12, 1967.

*Jesse Climenko* of counsel (*Sheldon D. Camhy* and *Samuel J. Gilbert* with him on the brief; *Shea Gallop Climenko & Gould,* attorneys), for appellant.

*Emile Z. Berman* of counsel (*George W. McGrath, Jr., Marvin V. Ausubel* and *William J. Allingham* with him on the brief; *Sage Gray Todd & Sims,* attorneys), for respondent.

BOTEIN, P. J.  In this action to recover brokerage commissions and fees, defendant appeals from a judgment entered in favor of plaintiff on January 4, 1967, after trial without a jury.

Plaintiff is a real estate broker who for several decades had been the exclusive mortgage correspondent in New York City for the Travelers Insurance Company of Hartford, Connecticut. As such, he testified, it was his " duty to represent Travelers' interests in connection with all loans made by Travelers in New York City area "; and Travelers required communications from borrowers to be channeled through him.  On some loans he would " also act as the loan broker as well as the mortgage correspondent for the Travelers ".

Defendant corporation is a builder, described by plaintiff as " a large public corporation."  In the Fall of 1962 defendant contemplated erecting a co-operative apartment house on East 64th Street in New York City, and was " looking for construction and permanent financing."  Officers of defendant approached plaintiff, showed him sketch plans, told him they had come to him because they knew he was the Travelers' sole mortgage representative, and asked whether he thought Travelers would be interested.  Plaintiff replied, " yes, I thought we would be interested, but I will have to review the sketch plans and they would have to review the authorization form and the application form to see if they would have any objection to it."

Under date of November 2, 1962 defendant executed Travelers' application form for a mortgage loan of $7,250,000 on a 33-story building.  The authorization form to which plaintiff referred is evidently the printed form customarily demanded by plaintiff from one retaining him to obtain mortgage financing.  The copy in evidence would have authorized plaintiff to obtain a permanent mortgage loan commitment of $7,250,000, and, against that commitment, a $6,525,000 construction mortgage commitment. The form — submitted to defendant by plaintiff — fixed plaintiff's fee for his services at 2½% of the permanent mortgage commitment, with the following provision for payment: " This

fee shall be due and payable at the time when the commitments for the permanent mortgage and the construction mortgage are issued by the lenders on the basis in each case of the terms mentioned above. As a matter of convenience to the Undersigned, however, it shall be paid to the time of the first advance on the construction mortgage. In the event the first advance on the construction mortgage is not taken up within ninety days after issuance of commitment therefor, this fee shall be then immediately due and payable.''

Defendant refused to sign plaintiff's form, and instead prepared a different form, which both parties signed. The latter form, also dated November 2, 1962, retained plaintiff to procure the two commitments above mentioned, and promised him compensation as follows: ''In consideration of your services in procuring such mortgage loan commitments and your services in making the necessary appraisals of the property, as required by the proposed lender or lenders, we agree that your commissions shall aggregate 1% of the principal amount of the permanent mortgage loan and 1% of the principal amounts of the construction mortgage loan. In addition, you shall be paid a fee for construction inspection service an amount equal to ½ of 1% of the principal amount of the permanent mortgage.''

The commission relating to the construction mortgage loan was not payable unless '' actually consummated with such terms and provisions in the mortgage documents as are satisfactory to us,'' in which event it was payable at the rate of 1% of each advance by the lender if, as and when received by defendant. With regard to the remainder of the stipulated compensation, for which judgment was rendered below, the agreement provided: '' You shall not be entitled to any further compensation as set forth above unless and until the permanent mortgage loan, which is the subject of such commitment, is actually consummated with such terms and provisions in the mortgage documents as are satisfactory to us.

'' Except as set forth above with regard to the time for payment of your commission regarding the construction mortgage loan, *if for any reason whatsoever except for our own willful default any of the foregoing events shall not have occurred, you shall not be entitled to compensation of any kind for services rendered or advice given in connection therewith.''* (Emphasis supplied.)

It will be noted that the above provisions were substituted for those in the authorization form prepared by plaintiff and rejected by defendant which would have made plaintiff's fee '' due and payable at the time when the commitments for the

permanent mortgage and the construction mortgage are issued by the lenders''

A construction mortgage loan commitment, in the increased amount of $7,250,000, was issued by Bankers Trust Company in December, 1962. During that month, also, Travelers issued a commitment for the desired permanent mortgage loan, which, with some changes agreed to by plaintiff on behalf of Travelers, defendant accepted. With such acceptance, and at plaintiff's request, defendant paid him, as agent for Travelers, $72,500 as a standby fee. Accompanying the check was a letter from defendant to plaintiff, as such agent, and agreed to by plaintiff on behalf of Travelers, reading in part as follows: '' This check is being delivered on condition, however, that such standby fee is to be returned to us in the event the said mortgage loan shall close or in the event the said mortgage loan shall not close for any reason other than our willful default. Upon the retention of such standby fee by The Travelers Insurance Company, The Kratter Corporation [defendant's former name] shall have no further liability under such commitment.

'' For the purposes of this understanding, a failure to close such mortgage arising out of any defects in title to the mortgaged property shall not be deemed a willful default on our part.''

On May 20, 1963 the construction mortgage loan commitment was consummated by defendant's delivery of a note and mortgage to Bankers Trust Company and by defendant's execution with that bank of a building loan agreement. In joining in that agreement Bankers relied upon a letter from Travelers promising to purchase the note and mortgage for the aggregate of Bankers' advances not exceeding $7,250,000. The letter also stated: '' We also agree that as often as advances are requested by the owner under your building loan contract we shall furnish you, upon your request, with a written statement of approval or rejection of the stage of construction of the improvements. In this connection, we advise you that any two of the following persons are authorized to give such statements on behalf of this Company: ''—plaintiff being one of the persons listed. Accordingly, statements cosigned by plaintiff, reciting '' On behalf of the Travelers Insurance Company, we accept the construction of this date,'' were sent periodically to Bankers, which made the required advances.

Plaintiff was paid, after recourse to suit, all but $2,274.48 of his stipulated percentage of the advances, and that there is due him such balance is not disputed. In dispute is plaintiff's right to any additional compensation, for, as related below, the

permanent mortgage loan was not consummated, and the parties differ as to whether the reason therefor was "willful default" on the part of defendant.

As plaintiff and Travelers were of course aware, defendant had in mind constructing a co-operative apartment project. During the Spring and Summer of 1964, as the structure was rising, defendant found that sales of the apartments were well below expectations, and that prospects would continue to be poor unless the anticipated selling price and monthly maintenance charges could be substantially reduced. "It was obvious it would be a flop," according to defendant's vice-president, who also testified, "The cost of the building had gone way beyond original estimates." Plaintiff also recognized the adverse market situation. Thus in a letter to Travelers dated June 19, 1964, he wrote, "We feel that the quality and worth of these apartment offerings in this cooperative venture are substantially better than in other competing properties. We are fully aware, however, of the loose rental situation in similar type buildings which would have an indirect bearing on the sales acceptance of these apartments." A month later he wrote, "there is a competitive rental situation here in this area which might adversely affect the ready sale of their apartments."

As a consequence of defendant's apprehensions it requested Travelers' consent to revisions of the agreed terms of the mortgage loan in ways which would bring about a reduction in carrying charges. The requests were addressed to plaintiff who transmitted them to Travelers with the letters mentioned in the preceding paragraph. Travelers refused to consent to any modification of loan terms, although on August 31, 1964 it did accede to defendant's request that the commitment be extended for six months to May 1, 1965. Thereafter there were telephone conversations between defendant's representatives and Travelers' officers. One of the latter described defendant's position as follows:

"Initially, they had planned to sell this as a co-operative apartment and at that time were thinking of going condominium. They felt that the amount of cash that would have to be put up by a prospective purchaser for one of these apartments was greater than the market would stand at that time.

"They needed some modification of the loan so as to stretch it out over a longer period of time or more money or some modification, which would assist them in marketing these apartments.

"They asked whether we would be willing to consider modification of the loan and I said that we would not.

" They then asked whether we would be willing to permit them to seek a commitment from another lender for it would better satisfy their requirements. I said that we would. * * *

" They thanked us for being willing to relieve them of the commitment if they could do better and said we would hear from them.''

The same officer testified, '' We were not taking any applications on condominiums.'' The conversations culminated in a letter dated November 16, 1964 from Travelers to defendant, accepted at the foot by the latter, setting forth the following arrangement: '' Your further summarization of the situation is correct in that we understand that you are interested in obtaining permanent financing on terms other than those previously committed by us. We remain unwilling to extend the present expiration date of, or make any other change in, our commitment; however, in the event you are able to arrange satisfactory permanent financing elsewhere, we will release you from your commitment upon receipt by us prior to May 1, 1965 of the following: (1) a release by you of our commitment, (2) a statement from Bankers Trust Company releasing us from our commitment to them, and (3) your agreement to indemnify and hold us harmless against any claims made against The Travelers as a result of such termination, but exclusive of any claims arising from commitments or agreements made by The Travelers and unknown to you. Upon cancellation of the subject commitment in accordance with the foregoing, we will refund to you the $72,500 presently being held by us.'' Plaintiff did not participate in these negotiations. The letter indicates that a carbon copy was to be sent to him.

The condition in the letter — that defendant be able to arrange satisfactory permanent financing elsewhere — was fulfilled. The record indicates that defendant converted its project from a co-operative form to a condominium form and obtained bank financing in the amount of about $9,000,000. By agreement between Travelers, Bankers and defendant dated December 29, 1964, it was agreed '' at the request of Kratter '' that the agreement constituted by their various letter agreements '' be and the same hereby is in all respects cancelled and that none of the parties hereto have or shall have any obligations to any of the other parties with respect to any of the provisions or comitments contained in said letter agreements.'' Defendant also agreed to indemnify Travelers in the manner provided in the November 16, 1964 letter, and Travelers agreed to refund '' the commitment fee of $72,500 ''. The refund was thereafter

made, Travelers retaining the interest earned on the amount, since, as its officer testified, "It is customary in the case of a deposit to account for the principal only."

We think it unnecessary to explore the connotations of the word "willful" as parsed in cases, texts and dictionaries, because in our opinion there was no default in the first instance. Quoting from Corpus Juris Secundum (vol. 26A, p. 127), plaintiff defines a default as "a failure to perform whatever one was bound by contract to do without regard to how the failure came about." Defendant was not bound to proceed with the loan. At one time, to be sure, it had been so obligated, but the obligation was changed, albeit at defendant's request, by mutual consent. It became agreeable to both parties that their compact should terminate if defendant could better meet its needs elsewhere; and that it should continue if defendant could not. Defendant had solicited modifications of the loan terms in vain, and an extension of the commitment period with success. Its request initiated the November 16, 1964 letter arrangement, but up to that date it had not refused to proceed with the loan and there is no showing that it intended to refuse had the arrangement not been made or not consummated, or that Travelers anticipated refusal.

It is not questioned on this record that defendant was financially able to proceed; it was referred to by plaintiff as "a large public corporation with the ability to carry on such a heavy investment." There is some evidence in the record that defendant may have at one time considered the possibility of withdrawing from the transaction. On April 9, 1964, when defendant's vice-president telephoned plaintiff to ask, apparently for the first time, if the commitment could be amended, and was told it was not likely, the officer, according to plaintiff, "then remarked that it might be worthwhile for the owners to drop the Travelers commitment." This early speculation was not communicated to Travelers, and plaintiff does not assert it as indicative of a resolve to withdraw.

Nor is there any point to discussing plaintiff's accurate enough argument that a principal may not bring about the failure of a condition and then avoid his obligation to a broker by reliance upon that failure (cf. *Amies* v. *Wesnofske*, 255 N. Y. 156). Defendant's liability to plaintiff could arise only from willful default—and there was no default, much less a willful one. The risk that cancellation might occur for some other reason was assumed by plaintiff (Restatement, Contracts, § 295, subd. [b]). A mutual cancellation of an agreement, neither party being in default, is not a default

by either. Neither is this a case where in relation to a third party it should be given the effect of a default. Defendant was motivated by unexpected economic factors; it is not chargeable with subterfuge. The record contains no index to Travelers' motivation. Plaintiff says that "Travelers agreed to the cancellation of commitment merely as an accommodation to the appellant." If so, Travelers may have believed this to be in its long-range interest to accommodate an important builder. And Travelers seemed unwilling to terminate unless defendant could arrange satisfactory permanent financing elsewhere. What significantly bears upon the issue here, and is less speculative, is that Travelers returned the standby fee — persuasive evidence that it did not regard defendant as in default. Travelers' practice with regard to such a fee was to hold it "until such time as it was disposed of either returning it at the time the loan was closed or by keeping it if the loan was not closed."

Relevant to the discussion is the close tie between Travelers and the plaintiff. He was not the usual third person, not the outsider who acts as broker for an institutional loan. Although in terms employed to obtain the commitment from 'a recognized institutional lender," plaintiff was approached because of his intimacy with Travelers and it was assumed that Travelers would be the permanent lender. As between defendant and Travelers plaintiff acknowledged that his primary obligation was to the latter. Testifying concerning the standby fee, plaintiff said, "I required a standby fee as a good faith deposit because this was an extra large loan and it was becoming a common practice of requiring standby fees on the part of the lenders. There were a number of prospective borrowers that had run out of commitments and the lenders had therefore lost the loan * * *. And I was obligated, under my correspondency arrangement with the Travelers, to protect their best interests. And I didn't want to see this loan disappear after they had committed themselves for it." If Travelers, whose interests plaintiff was primarily serving, did not think defendant had "run out" of the commitment plaintiff was retained to procure, it is difficult to see how plaintiff could justifiably think otherwise — how an event which was not a default in the eyes of Travelers, to whom the obligation was due, became one when looked at by plaintiff. In the circumstances under consideration it seems reasonable to suppose that plaintiff did not intend to give "default" a more rigorous interpretation than it was given by Travelers, which never took the position that a default had occurred.

The judgment entered on January 4, 1967, should be modified, on the law and the facts, to the extent of reducing the amount thereof to $2,274.48, with interest on $1,471.83 from February 17, 1965, and on $802.65 from March 4, 1965, and otherwise affirmed, with costs and disbursements to defendant-appellant.

McGivern, J. (dissenting). I dissent and would affirm. Defendant got what it bargained for and should pay.

In its amended answer, defendant admitted "that valid and enforceable commitments in respect of a construction mortgage loan and in respect of a permanent mortgage loan within the meaning of the brokerage agreement of November 2, 1962 between plaintiff and defendant, were obtained." The contract, prepared by defendant, directed that the commissions should not become due until the loan was "consummated," *but* as the majority opinion notes, it further says: "Except as set forth above with regard to the time for payment of your commission regarding the construction mortgage loan, if for any reason whatsoever *except for our* [defendant's] *own willful default* any of the foregoing events shall not have occurred, you shall not be entitled to compensation of any kind for services rendered or advice given in connection therewith." (Emphasis supplied.)

Then, the defendant, for its own ulterior purposes, arranged with Travelers for a cancellation of the mortgage commitment secured by plaintiff. Bluntly, it, the defendant, obtained a better deal elsewhere, and Travelers was magnanimous enough to release it from the commitment, without the consent of the plaintiff. But this magnanimity on the part of Travelers did not liberate defendant from its contractual liability to plaintiff.

That defendant recognized the plaintiff's role in the mortgage commitment is manifest from its letter of November 9, 1964, to Travelers. Therein, defendant cautiously broached the subject of cancellation because it had found greener pastures; but defendant at the same time clearly indicated it would not relinquish its hold on Travelers' commitment to it, in the event the other arrangements came to naught. Thus, it is indisputable that plaintiff having arranged the loan, would have recovered had not the defendant found terms more attractive in other quarters. This vacillation of the defendant's business mind should not prevent the plaintiff from legally recovering the commissions he had already earned.

The maneuver of the defendant in negotiating a better arrangement, without consulting the plaintiff, was the cause of the failure to fulfill the condition on which the plaintiff's

right to recover rested. Defendant cannot legally take advantage of a default or failure of a condition precedent caused by its own deliberate act. (*Amies* v. *Wesnofske*, 255 N. Y. 156, 162–163; *Stern* v. *Gepo Realty Corp.*, 289 N. Y. 274, 277.) In my opinion, the conduct of the defendant constituted a willful default within the fair intendment of the agreement prepared by defendant, and accordingly, plaintiff should recover.

It is rudimentary that if there is any doubt about the language inserted in the contract by the defendant, the language must be construed against the author defendant. The drafters were prescient enough in delineating circumstances under which they did not consider themselves liable for the commissions. They had the acumen to insert in the arrangement the clause cited by the majority: '' For the purposes of this understanding, a failure to close such mortgage arising out of any defects in title to the mortgaged property shall not be deemed a willful default on our part.''

The fact that the contract did not foresee the precise economic stress that was to beset the defendant is no justification for releasing the defendant from its obligation to the plaintiff, once the obligation had accrued.

It may be that the plaintiff enjoyed a preferential relationship with Travelers. That is why the defendant sought him out and profited by these special and close ties. Indeed, these were the plaintiff's stock in trade. This is manifest from the testimony: '' The Court: And would it be fair to say that in the trade or profession of obtaining mortgages that your intimacy with Travelers was one of the reasons why they came to you? The Witness: Exactly.'' But these ties may not be magnified so as to make him an alter ego for Travelers. Nor can they empower the defendant to conspire with Travelers in cutting him adrift, after using him.

Lastly, there is no basis for the majority's gratuitous statement: '' The risk that cancellation might occur for some other reason was assumed by plaintiff (Restatement, Contracts § 295, subd. [b]).''

A judicious perusal of subdivision (b) of section 295 fails to unearth any validity for the conclusion. Actually, the '' Illustration of Clause (b) '' of section 295 strongly indicates that under the facts of the instant case, the defendant cannot evade liability. Nor is there any citation under the New York annotations which would suggest that under the circumstances here prevailing plaintiff should be frustrated from the commissions he earned.

Accordingly, I would affirm the judgment entered in favor of the plaintiff, after a trial.

EAGER and RABIN, JJ., concur with BOTEIN, P. J.; McGIVERN, J., dissents and votes to affirm in opinion, in which CAPOZZOLI, J., concurs.

Judgment modified, on the law and the facts, to the extent of reducing the amount thereof to $2,274.48, with interest on $1,471.83 from February 17, 1965, and on $802.65 from March 4, 1965, and, as so modified, affirmed with $50 costs and disbursements to the appellant.