**DUBIN WESTON, INC., Plaintiff,**

v.

**LOUIS CAPANO & SONS, INC., Defendant.**

Civ. A. No. 4140.

United States District Court, D. Delaware.

April 28, 1975.

Joseph A. Rosenthal of Morris & Rosenthal, Wilmington, Del., for plaintiff.

Howard L. Williams of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant.

## OPINION AND JUDGMENT

LATCHUM, Chief Judge.

In this diversity suit,[1] Dubin Weston, Inc.[2] ("plaintiff") seeks to recover a brokerage fee in the amount of $23,250 from Louis Capano & Sons, Inc. ("defendant") allegedly due under a mortgage brokerage contract entered into between the parties. The case was tried by the Court without a jury on December 19, 1974. The Court, having considered the testimony and evidence adduced at trial and the post trial memoranda of the parties, enters the following findings of fact, conclusions of law and judgment.

Since 1970, the plaintiff has been and is a real estate and mortgage brokerage firm with its principal office in New York City. As such plaintiff has often been engaged as an agent by prospective borrowers to "find" interested lenders of money for permanent mortgage financing and building construction loans. (Tr. 26–27; Docket Item 27A, par. c 6).[3]

The defendant, a Wilmington construction company established in 1958, has built several residential home developments in Delaware, as well as small scale commercial projects and individual apartment units. Defendant's president and sole shareholder is Louis Joseph Ca-

---

1. Plaintiff is a corporate citizen of the State of New York and defendant is a corporate citizen of the State of Delaware. The amount in controversy, exclusive of interest and costs, exceeds $10,000. Consequently, jurisdiction exists by virtue of 28 U.S.C. § 1332.

2. At the time the brokerage contract was entered into plaintiff's corporate name was "Dubin, Weston & Baum, Inc." and defendant's corporate name was "Louis Joseph Capano, Inc." Thereafter their names were changed as reflected in the above caption. (Docket Item 27A, par. k).

3. Tr. refers to Trial Transcript.

pano ("Capano"). (PX 30, at 12). In 1969 the defendant entered into a contract with the Cavalier Country Club to purchase a 52 acre tract of land south of Wilmington for $700,000, intending to develop an apartment complex on the site. The contract called for the defendant to purchase a minimum of 10 acres each year over a five year period, purchase and payment to be made annually on February 1 (Tr. 80).

Financing for the first 10 acre parcel purchased ("Section I") consisted of a $2,300,000 construction loan provided by the Bank of Delaware and a permanent mortgage in the same amount was taken up by Colonial Mortgage Service Company. (PX 30, pp. 13–14). Because the mortgage market in the latter half of 1970 was very tight, (Tr. 27), as of December 1, 1970, the defendant had been unable to obtain financing for the second ten acre tract that had to be purchased and paid for by February 1, 1971 ("Section II").[4]

Sometime about December 2, 1970, Leon Siegel, one of plaintiff's salesmen, met with Capano, having been directed to the defendant by a mutual acquaintance. (Tr. 84; PX 30 at 83–84). Capano explained the type of financing the defendant needed for Section II and had the following authorization to the plaintiff typed out on defendant's stationery, which he then signed on behalf of the defendant:

"We hereby authorize you to obtain for us a permanent mortgage of $2,400,000 with a construction loan take out. The permanent mortgage to be at the rate of 9¾% interest, 25 year take out, 10.91 constant, 15 year loan; with an additional interest of 15% over and above the projected gross rentals, and a 1% fee to lender non-refundable. This authorization will expire the 25th of December 1970.

"The arrangement of the construction loan will be such that we will take down the payment for the second section mortgage of approximately $225,000, plus the interest, plus a 1% service charge to Dubin, Weston & Baum." (PX 14).

Capano also gave Siegel the plans and specifications for the proposed buildings to be constructed on Section II.

Siegel turned defendant's letter of authorization and the plans and specifications over to Herman D. Dubin ("Dubin"), plaintiff's president. (Tr. 29, 84–85; PX 30 at 90–91; Docket Item 27A, par. c 5). After telephoning Capano for further information, Dubin set about contacting some twenty-four prospective lenders on defendant's behalf. (Tr. 29–34; PX 33 a–j). About December 8 or 9, 1970, Dubin received a proposal from Dollar Savings Bank of New York ("Dollar") offering to take a permanent mortgage on Section II along the lines that defendant had authorized the plaintiff to find. (Tr. 34). Dubin telephoned Capano and told him of Dollar's proposal and while Capano seemed pleased he asked Dubin to "go back" to Dollar with a view to obtaining a $2,400,000 permanent mortgage loan on a 25 year pay-out. (Tr. 35). Dubin was unsuccessful in attempting to get Dollar to modify its proposal and upon notifying Capano of Dollar's position, Capano said he would come to New York City on December 14, 1970 and asked Dubin to set up an appointment with the bank officer handling the matter for Dollar. (Tr. 36).

On December 14, 1970 Capano and defendant's attorney, Howard L. Williams ("Williams") traveled to New York City in order to formally apply to Dollar for a permanent mortgage on Section II. Capano and Williams first met with Dubin at the plaintiff's offices. While in

---

4. Between mid-July and late-November 1970, Capano had contacted several prospective lenders both on his own initiative and through Gilpin, Van Trump & Montgomery, the rental agent for Section I. (PX 30 at 75). He also utilized the services of a young "free lance" mortgage broker, N. J. Oliveri, (PX 2, PX 4, PX 30 at 30–33, 41, 70), and of Latimer & Buck, Inc., (PX 30 at 55, 58), all without any success.

his office and on the way to the bank, Dubin repeated the terms of Dollar's proposal as he understood them, including the requirement that a M. A. I. (member appraisal institute) appraise Section II. (Tr. 41–42).

Before leaving plaintiff's office for the bank appointment, Capano and Dubin on behalf of the defendant and plaintifff executed an agreement[5] on plaintiff's letterhead which reads as follows (PX 39):

"Dubin, Weston & Baum, Inc.
331 Madison Avenue
New York, New York 10017

Re: Cavaliers Golf View Apartments
Wilmington, Delaware

Gentlemen:

We hereby authorize you to obtain a first mortgage loan, for us, in the amount of $2,325,000 with interest at 9½% per annum, for 22 yr. 5 mo. years, with amortization payments of 1.30%, making a constant payment of 10.80 per annum, payable monthly, on our property located at the above mentioned premises. We also authorize you to obtain a construction loan to finance the first mortgage mentioned above.

Your commission for obtaining a commitment, on the above terms or on such other terms as we may approve shall be $34,875. This commission is due and payable upon our receipt and acceptance of the commitment.

We agree to pay the usual disbursements which include the charge of attorney for mortgage, cost of title insurance policy, mortgage recording tax and Government stamps, if any, survey, appraisal, recording fees and all other disbursements in connection with closing of the loan.

If we, or any company with which we are associated, negotiate for a loan with the lender involved with this commitment, within 3 years, you are entitled to a full commission on said loan. This commission is due and payable upon our receipt of said loan commitment.

This authorization is to remain in force until the close of business, Dec. 31, 1970.

Very truly yours,
s/ Louis Joseph Capano, Inc.
s/ Louis Joseph Capano, Pres.

Employment Accepted
Dubin Weston & Baum, Inc.
s/ H. D. Dubin"

---

Penned in ink and initialed by Capano and Dubin on the lower left hand corner of the above letter was the statement "In the event that only the permanent mtge is accepted, the commission will be $23,500."

5. The agreement was apparently a form letter and the underlined portions were typed in before it was executed.

After this agreement was executed, Dubin then escorted Capano and Williams to Dollar's offices. There Dubin, Capano and Williams met with Fred Hanken ("Hanken"), a vice-president of Dollar. Hanken handed them a prepared printed application and attached rider for a $2,325,000 first mortgage loan on Section II. (PX 16). The term of the mortgage, interest rates, amount of monthly payments and other terms were typed in; just below this, the application contained the following printed paragraph with several underlined figures typed in:

"This application shall be irrevocable for a period of 20 days from the date hereof. Applicant deposits with the Bank, at the time of making this application, the sum of $23,250. to be held by the Bank without interest, as security for liquidated damages, which sum the parties hereto agree shall be liquidated damages, and shall be retained by the Bank in the event that: a) the applicant attempts to revoke this application or refuses to accept a commitment before the expiration of said 20 day period, or b) for any reason, other than the default of the Bank under its commitment, the loan does not close on or before June 30, 1972 or, as extended by the Bank in writing. This provision for liquidated damages is inserted herein in view of the difficulty of establishing the damages of the bank (sic) in either of the foregoing circumstances. Said deposit to be returned to applicant upon closing of this mortgage loan, or in the event that the Bank rejects this application."

Following this paragraph a printed statement appeared which reads:

"It is understood that, if the Bank accepts this application, its obligation to make the loan shall be conditioned upon:"

The three conditions then appearing required the defendant (1) to pay the charges of Dollar's counsel, expense of the title insurance, surveys, mortgage tax, recording fees incident to making the loan, (2) to deliver extended coverage fire insurance policies payable to Dollar in companies and amounts acceptable to Dollar, and (3) stipulated that Dollar's counsel must give an opinion that the title, closing documents and mortgage were satisfactory at the closing of the loan. Just below these provisions what would have been a fourth condition was crossed out and words "Rider attached" were typed in. The sheet attached to the application, entitled "Rider to Application No. 57069" contained items numbered 5 through 14.

Items 7 and 9, in relevant part, read as follows:

"7) Applicant shall pay to the Bank upon the signing of this application a non-refundable fee of $23,250. Which shall be deemed wholly earned by the Bank upon the issuance of its commitment based upon this application.

. . .

"9) Subject to an appraisal made by an M.A.I. selected by the Bank, in an amount not less than $3,200,000., the cost of which will be paid by the applicant."

Hanken explained that if Capano signed the application and rider and deposited $46,500, Dollar intended to send two in-house appraisers to Delaware to conduct a site inspection of Section II. After they reported back, Dollar's Real Estate Committee would then decide whether or not to issue the permanent mortgage loan commitment in accordance with defendant's application. (Tr. 45). Hanken added that if the mortgage loan went through to closing, $23,250 would be refunded to the defendant. (PX 30 at 102). In response to Capano's inquiry about the required M.A.I. appraisal, Hanken gave him the names of about four M.A.I.s in the Delaware area noting that Capano was to select the M.A.I. appraiser and pay him. (Tr. 50–51, 87; PX 30 at 103, PX 41 at 29–31). Hanken did not specify how soon the M.A.I. appraisal had to

be prepared, (Tr. 56), even though the mortgage loan was scheduled for closing on or before June 30, 1972. (PX 16). Capano signed both the application and rider on behalf of the defendant and delivered a check for $46,500 to Dollar. (PX 18). He was not permitted to take a copy of the application and rider with him. (Tr. 54).

During the next week Dollar sent two in-house appraisers, (PX 41 at 9–11), to the Section II site. (PX 30 at 107–108; PX 41 at 9–11). They determined the value of the land and proposed apartment units to be built on Section II to be $3,200,000, (PX 15), thereby confirming Dollar's ability (in accordance with its established formula) to lend $2,325,000, (Tr. 53–54, 57), which represented 73% of the "appraised value." (PX 15). Hanken telephoned Dubin and informed him of this determination. (Tr. 57; PX 36–B).

Dollar's Real Estate Committee approved the defendant's loan application on December 24, 1970 and Hanken so informed Dubin by phone. (Tr. 58). Dubin immediately telephoned Capano, advising him that as soon as Capano received a copy of the commitment letter which Dollar would forward to defendant shortly, (PX 19), the plaintiff's commission would be due. (Tr. 58). Dollar sent a letter dated December 24, 1970 to the defendant and to the plaintiff, together with a copy of the executed application and rider, which reads (PX 19):

"Your application for a first mortgage loan covering Cavaliers Golf View Apts., Sect. II, New Castle Co., Delaware has been approved by the Bank subject to the conditions outlined therein. Our attorneys, Messrs. Thacher, Proffitt, Prizer, Crawley & Wood, 40 Wall Street, New York, New York 10005 will communicate with you.

"This commitment will terminate on June 30, 1972.

"Copy of application signed by you is enclosed."

A week later on December 30, 1970, Dubin called Capano to ascertain why the defendant had not paid the $23,250 commission to plaintiff since plaintiff had received its copy of the December 24 commitment letter from Dollar. (Tr. 58). Capano stated that he had not received the correspondence yet and because he was a little "short" of money proceeded to discuss the modification of the method for paying the plaintiff's commission. (Tr. 59). Dubin agreed to permit the defendant to pay one-half of the commission immediately and the balance upon the first draw of the construction money. (Tr. 59). The defendant, however, never paid any part of the commission and Dubin was unable to contact Capano to find out why. Moreover, Dubin did not hear from Dollar until March 1971, when Dollar called to inform him that a M.A.I. appraiser had appraised Section II in an amount less than $3,200,000. (Tr. 74).

Around the first of the year (1971) Capano selected Robert Truman ("Truman") who was one of the Delaware area M.A.I. appraisers suggested by Hanken but whom Capano had not dealt with before, (PX 30 at 121), to make an appraisal of Section II. Capano advised Truman of the $3,200,000 appraisal requirement and provided plans and specifications for him to undertake the appraisal. According to Capano, Truman orally informed him in mid-January that he was having trouble coming up with a $3,200,000 minimum appraisal. (Tr. 101–102, 94–96). Truman after inspecting the property on February 3, (Tr. 17), prepared a written report on February 25, 1971 in which he formally appraised the value of Section II at $2,500,000. (PX 20; Tr. 14). His report was based on the data and specifications that Capano had provided. (Tr. 10; PX 30 at 122). Although Truman testified at trial that he could only have informed Capano of a "low" appraisal after February 3, he may have done so before that date.

Capano personally did not notify either Dollar or the plaintiff of Truman's

"low" appraisal. (PX 30 at 128–129). Instead, Williams, defendant's attorney, contacted Dollar by letter dated March 5, 1971. In that letter Williams informed Dollar of Truman's appraisal of $2,500,000, (PX 17, page 2), stated that Dollar's commitment was not "presently operative," and requested the return of the $46,500 deposited by the defendant with Dollar. Dollar's attorneys responded to Williams' letter on March 17, 1971, refused to return the $23,250 on the ground that the fees had been completely earned when Dollar had approved the defendant's loan application and had issued the permanent mortgage commitment on December 24, 1970 and refused to return the remaining $23,250 pursuant to the clause in the application governing liquidated damages. (PX 40). Dollar noted receipt of the "M.A.I. appraisal in its files" as of March 22, 1971, (PX 15), but the plaintiff never received a copy of Truman's appraisal report. (Tr. 65).

Upon first being informed by Truman in January 1971 of a "low" appraisal, Capano nevertheless instructed Truman to complete his report, (Tr. 18, 96), and he also decided then to "look elsewhere for mortgage money." (Tr. 93). Coincidentally, after January 1, 1971, interest rates for mortgages had dropped by one-half point or more. (Tr. 28). Earlier than January 14, 1971, Capano spoke with Colonial Mortgage Service Company in Philadelphia ("Colonial") about finding financing for Section II. (PX 21). On January 26, 1971 the defendant signed a 45-day Exclusive Authorization agreement with Colonial, which provided in relevant part (PX 27):

> "[W]e feel we can produce a mortgage commitment in the amount of $2,400,000 bearing interest at the rate of 9⅛% per annum for a term of 25 years, or a 10.18% annual constant. This project shall be submitted with the understanding that there will be a 15% holdback, amounting to $360,000 until such time as 85% of the antici-

pated income is reached with 85% of the 192 rented (164).

\* \* \* \* \* \*

> "Our fee for providing this commitment shall be 1½% of the amount, . . . In addition to this fee, you shall be responsible for any fees incured by you, such as settlement costs, legal fees, title insurance, recording fees, and an appraisal fee should it be required by the Institutional Investor. Furthermore a placement fee of 1% will be paid to the Institutional Investor at the time of acceptance of the commitment on the above terms."

On March 12, 1971 Colonial forwarded to the defendant a "mortgage package" that consisted of 1) a letter from the United States Savings Bank of Newark ("USSBN"), dated February 16, 1971 and addressed to the defendant in care of Colonial, (PX 22), and 2) a cover letter from Colonial dated March 12, 1971. (PX 28). Not unexpectedly the terms of the Colonial package were more favorable than the Dollar proposal.

The February 16 correspondence from USSBN opened with the statements that USSBN would "loan . . . the sum of $2,400,000 . . . . secured by a first mortgage. . . . This commitment is subject to the terms and conditions set forth below. . . ." Seventeen conditions were then set forth. Condition 14 expressly stated "[T]his commitment is subject to the procurement of participants in the mortgage in the minimum amount of $1,400,000."

The cover letter from Colonial to the defendant dated March 12, 1971, (PX 28), explained that with respect to

> "[C]ondition # 14 of their [USSBN] commitment. . . . [Colonial has] received an approval from the Binghamton Savings Bank of Binghamton, New York, in which they have written . . . agreeing to participate in the amount of $650,000. [Colonial] . . . hereby commits itself to join in the participation for the remaining $750,000. . . . [C]ertain additional conditions imposed by the

Binghamton Savings Bank in their letter to Colonial and Colonial's own requirements are being set forth below, and it is to be understood that all conditions of both the U.S. Savings Bank letter and this letter must be met and complied with."

Eight conditions were outlined in the body of the cover letter,[6] and nine additional "terms and conditions on the attached commitment Schedule 'A'" were also specifically incorporated in the "commitment." The closing sentences of the cover letter read:

"It is required that you accept both commitment letters, which are then to be considered as the commitment covering Section II. Conditions of both commitments, therefore, become the overall conditions of the commitment."

On March 31, 1971 Capano signed the cover letter and the letter from USSBN, thereby accepting the USSBN/Binghamton Savings Bank/Colonial commitment for permanent mortgage financing of Section II. A construction loan for Section II in the amount of $2,400,000 was actually granted by the Bank of Delaware during July 1971. (PX 23; Tr. 114). Subsequently, one M.A.I. appraisal was submitted on August 25, 1971 by Daniel A. Dinote, Jr., of Drexel Hill, Pennsylvania. (PX 32). Dinote appraised the value of Section II at $3,300,000, and his appraisal was confirmed by Donald S. Tinley, "Appraiser," on September 11, 1971. (PX 24).[7]

The issue before the Court is whether the plaintiff fulfilled its contractual undertaking so that the defendant is obligated to pay the plaintiff the brokerage commission of $23,250. Since this is a diversity suit, the Court is bound to apply Delaware's conflict of law rules. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Actions for breach of contract, under Delaware law, are governed by the law of the place of performance. Canadian Industrial Alcohol Co. v. Nelson, 8 W.W. Harr. 26, 188 A. 39, 53 (Del.Supr.1936). Since the place of performance was New York, the contract law of that state governs.

The instrument that constitutes the brokerage contract between plaintiff and defendant is the authorization agreement which Capano signed on defendant's behalf on December 14, 1970. (PX 39). Under that agreement, plaintiff undertook to obtain a commitment for a permanent mortgage loan[8] covering Section II in the amount of $2,325,000 with interest at 9½% per annum for 22 years, 5 months and with amortization payments of 1.30%, making a constant payment of 10.80% per annum payable monthly. If by the close of business on December 31, 1970, the plaintiff had obtained a commitment for a permanent mortgage loan covering Section II on these terms or on such other terms as the defendant approved, the defendant was obligated to pay the

**6.** Condition 4 stated: "This commitment is conditioned upon . . . [receipt of] a satisfactory appraisal in an amount of not less than $3,300,000 . . . signed by two of the following appraisers. . . . [Colonial] . . . is to arrange for the obtaining of this appraisal."

Condition 7 stated, in relevant part: ". . . Colonial is to receive a commitment fee of 1½% of the mortgage amount, or $36,000. We now consider this fee fully earned by us. We agree to defer payment of the fee until the time of the construction loan settlement for Section II, but not later than July 15, 1971. . . ."

**7.** Tinley was president of Kinder & Furman, Inc., realtors, Prospect Park, Pennsylvania. Truman testified that the discrepancy between his $2,500,000 appraisal of Section II and the $3,300,000 appraisal made by Dinote was largely explained by a bona fide difference in opinion regarding whether the proposed Section II's rental rates were too high. (Tr. 20).

**8.** The mortgage lender agrees that, upon completion of a building project, it will repay the total outstanding loan which provided the financing for construction of the project (the "construction loan") to the construction loan lender in return for the issuance of a mortgage by the borrower-owner.

plaintiff a commission of $23,250 ("due and payable upon our [defendant's] receipt and acceptance of the commitment.").

■ Capano testified that when he signed the brokerage contract with plaintiff he believed that the defendant was obligated to pay the brokerage commission only in the event that a commitment to grant a permanent mortgage loan covering Section II was "guaranteed," and he also testified that in his opinion such a guarantee did not exist until the construction loan lender closed[9] the construction loan covering Section II. (Tr. 86, 112–113; PX 30 at 120, 135).[10] This testimony is incredible. First, the brokerage contract made no reference to a "guaranteed" commitment. Second, a commitment for a permanent mortgage loan is generally defined as a mutual agreement between a lender and the borrower-owner that the former will grant a mortgage loan at certain terms upon completion of construction of the property to be mortgaged. Its existence is in no way predicated upon the closing of the construction loan. See H. E. Hoagland & L. D. Stone, Real Estate Finance, at 307, 346 (4th ed.); R. Kratovil, Real Estate Law, at 211–212, 296–298 (4th ed.). Thus, it is inconceivable that Capano, who heads an established construction company and who was advised by defendant's counsel before signing the brokerage contract, (PX 39), believed that a "commitment" meant a guaranteed promise to grant a permanent mortgage,[11] even if the language of the brokerage contract were assumed to be ambiguous and consequently had to be construed against the plaintiff, who drafted it.[12] Ralph Hochman & Co. v. Fort Stanwix Mfg. Co., 284 F.Supp. 995, 999 (N.D.N.Y.1967).

■■ Under New York contract law, in the absence of an agreement to the contrary between the mortgage broker and the borrower-owner, the broker completes his contractual duty to obtain a commitment and thereby earns his commission when the lender issues an acceptable permanent mortgage loan commitment to the owner, despite the fact that subsequently either the construction loan or the permanent mortgage loan is not granted at its respective closing. Grace v. Norwich Green Homes, Inc., 144 N.Y.S.2d 62 (Sup.Ct., Trial Term, Nassau County, 1955); Buck v. Broadway Trinity Place Corp., 110 N.Y.S.2d 662, 668–670 (Sup.Ct., Trial Term, Kings Co., 1951); Fairfax Associates, Inc. v. Slater, 36 Misc.2d 537, 232 N.Y.S.2d 316, 317 (Sup.Ct., Special Term, Nassau Co., 1962); Aiello v. B. E. P. R. A., Inc., 39 A.D.2d 541, 331 N.Y.S.2d 924 (Sup.Ct., Appellate Div., 1972); E. Biskind & C. Barasch, Law of Real Estate Brokers, § 75 at 59–60 (Supp. 1973); Weniger v. Union Center Plaza Associates, 387 F.Supp. 849, 860–862 (S.D.N.Y.1974). Therefore, since the plain meaning of the agreement between plaintiff and defendant is given legal effect under New York law, the only matter left for the Court to determine is

---

9. A "loan" is granted at "closing."

10. Ordinarily, a construction loan lender will not close a loan intended to provide the financing for the construction of a project unless the owner has a pre-existing commitment for a permanent mortgage loan that has been issued by another lender. (Tr. 55, 69; PX 30 at 44).

11. The language used in the brokerage contract that defendant entered into with Colonial in January 1971 (PX 27) and that used in the USSBN/Binghamton Savings Bank/Colonial commitment for a perma-

nent mortgage loan for Section II that defendant accepted in March 1971 (PX 22, 28) also indicate that Capano understood that a commitment for a permanent mortgage loan exists prior to the closing of a construction loan.

12. A construction of the brokerage contract which reflects the defendant's alleged concept of a "commitment" is quite difficult to accept as plaintiff undertook to obtain a commitment by December 31, 1970, and the closing of a construction loan for Section II could not possibly have occurred before that date.

whether Dollar issued a "commitment" for a permanent mortgage loan for Section II upon terms acceptable to the defendant.

■ A commitment for a permanent mortgage loan is an enforceable contract under which a lender agrees to grant a mortgage loan at a later date. Weniger v. Union Center Plaza Associates, 387 F.Supp. 849, 861–862 (S.D.N.Y.1974); Sonnenblick-Goldman Corp. v. Murphy, 420 F.2d 1169, 1173 (C.A.7, 1970); Ivor B. Clark, Inc. v. Boston Road Shopping Center, Inc., 24 Misc.2d 84, 207 N.Y.S.2d 582, 589 (Sup.Ct., Special and Trial Term, New York County, 1960); Boston Road Shopping Center, Inc. v. Teachers Ins. & Annuity Assoc. of America, 13 A.D.2d 106, 213 N.Y.S.2d 522, 526 (Sup.Ct., App.Div.1961) aff'd 11 N.Y.2d 831, 227 N.Y.S.2d 444, 182 N.E.2d 116 (Ct. of Appeals, 1962). See Suffolk County Mtge. Co. v. Shea, 44 Misc.2d 266, 253 N.Y.S.2d 589, 590–592 (Sup.Ct., Special Term, Suffolk County, 1964). Consequently, in order for a "commitment" to exist it is necessary only that the lender and borrower-owner concur as to the essential terms of the future mortgage loan transaction. Weniger v. Union Center Plaza Associates, *supra*, at 861; Zelazny v. Pilgrim Funding Corp., 41 Misc.2d 176, 244 N.Y.S.2d 810, 816 (Dist. Ct., Nassau Co., 1963); Waltess Estates, Inc. v. Miller, 237 N.Y.S.2d 539, 540–541 (Sup.Ct., Special Term, Suffolk Co., 1963). See Bowery Savings Bank v. Retail Realty, Inc., 10 A.D.2d 924, 200 N.Y.S.2d 678, 679 (Sup.Ct., App.Div. 1959); Warnecke v. Countrywide Realty, Inc., 29 A.D.2d 54, 285 N.Y.S.2d 428, 429–431 (Sup.Ct., App.Div., 1st Dept. 1967), aff'd 22 N.Y.2d 823, 292 N.Y.S.2d 917, 239 N.E.2d 656 (Ct. of Appeals, 1968).

■ Applying these standards, the Court finds that an enforceable commitment for a permanent mortgage loan was issued by Dollar to the defendant on December 24, 1970. Capano signed an application which specified terms of the permanent mortgage loan such as the amount of loan and repayment schedule, and the Real Estate Committee of Dollar Savings Bank accepted this application notifying defendant of its acceptance by letter dated December 24, 1970. (PX 19). Although defendant argues that the agreement was not enforceable because Dollar could not ultimately grant the mortgage loan because the appraised value of Section II was less than $3,300,000, the existence of such a proviso in the application and rider, (PX 16), does not render the commitment void by converting Dollar's promise into an illusory one. Rather, this proviso, like the other "conditions" which the application and rider contained, was a condition precedent to the future performance of the commitment, i. e., to the closing of the permanent mortgage loan. See, e. g., Zelazny v. Pilgrim Funding Corp., 41 Misc.2d 176, 244 N.Y.S.2d 810, 816 (Dist.Ct., Nassau Co., 1963); A. L. Corbin, Contracts, § 628.

Accordingly, the Court finds that Dollar issued an enforceable commitment for a permanent mortgage loan on December 24, 1970 and that under the brokerage agreement between the parties, (PX 39), the plaintiff earned a commission fee of $23,250 and was entitled to payment on that date.

Judgment will be entered for the plaintiff against the defendant in the amount of $23,250 plus interest from December 24, 1970 and suit costs.

The above shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

## JUDGMENT

It is ordered that judgment is hereby entered in favor of the plaintiff, Dubin Weston, Inc., and against the defendant, Louis Capano & Sons, Inc., in the sum of $23,250 together with legal interest thereon from December 24, 1970 and suit costs.