Kaye, J.
(dissenting). The majority concludes that ambiguities in the brokerage agreement make summary judgment inappropriate in this suit by a loan broker to recover its commission. In that any ambiguity in the brokerage agreement is unnecessarily created by the majority’s interpretation of the contract — an interpretation contrary to established principles of contract law — I dissent.
The first paragraph of the brokerage agreement provides that
"[i]n the event such commitment fails to be executed by all parties and delivered, or if such commitment is executed and delivered and the initial disbursement thereunder fails actually to be delivered, received and accepted in accordance with the terms of such commitment for any reason whatsoever, except the willful default of Atrium, then and in that event the undersigned will waive, and does hereby waive, all claim or demand, in law or in equity, for any commission whatsoever in connection with such commitment, the Loan and all negotiations prior thereto.”
The second paragraph states that "[i]f and only in the event that the Loan closes and the initial disbursement thereunder is actually delivered, received and accepted in accordance with the terms of such commitment, then, and in that event the undersigned does hereby agree to accept a commission [of $225,000] * * * payable as follows [$125,000 on the date the loan closes and $100,000 on August 31, 1985].”
The broker argues that the first paragraph of the agreement sets out when the commission is earned and the second when it is paid. Clearly this is what the agreement says: the first paragraph deals with legal rights and conditions precedent to entitlement — including the provision that no commission is earned if funds are not taken down, unless Atrium willfully defaults — while the second paragraph refers to time and other details of payment.
The majority concludes that the second paragraph may reasonably be read as revisiting the ground covered by the first, but providing for different rights and liabilities, thereby creating an inconsistency between the two provisions. The *497 "unsychronized” provisions thus make the willful default clause "inoperable” (majority opn, at 494, 495).
But reading the agreement as a single integrated contract and giving effect to all its provisions — as we are obliged to do —we cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms "inoperable,” and creates a conflict where one need not exist (see, Chimart Assocs. v Paul, 66 NY2d 570, 573; Williams Press v State of New York, 37 NY2d 434, 440).
Atrium argues that ambiguity exists — if at all — only with respect to the meaning of "willful default,” analogizing this case to Graff v Billet (64 NY2d 899). In Graff, this Court held that, until a sales contract was executed, a seller could not "willfully default” under a real estate brokerage agreement that provided that the broker earned its commission when title passed. Mere failure of the seller to enter into a sales contract could not be a "willful default” as that term was used in the brokerage agreement. Although the term "willful default” was susceptible of different interpretations, we resolved any ambiguity against the broker/drafter and granted summary judgment to the seller.
The Graff rule obviously cannot be mechanically applied to a loan brokerage agreement. As exemplified by this case, in loan brokerage agreements (unlike real estate brokerage agreements) there is no sales contract specifying the details of a closing that will take place in the future; the commitment letter itself contains such details. Here, for example, the commitment letter was signed by both parties, required a $150,000 down payment from Atrium, and obligated Carteret to lend $14.25 million, with closing to take place within 60 days. In addition, Atrium settled a subsequent lawsuit brought by Carteret for miscellaneous closing costs incurred by the lender..
The commitment letter thus may be analogized to the sales contract, placing the transaction in a "legally recognizable form” (Graff v Billet, 101 AD2d 355, 356, affd 64 NY2d 899, supra). Just as signing a sales contract in Graff was the threshold legal requirement that could trigger a "willful default” by the seller, so execution of the commitment letter is the equivalent event in the lender/borrower context.
A broker ordinarily earns its commission when the ready, willing and able lender delivers a commitment letter to the borrower — unless the parties vary that rule (see, Dubin We *498 ston, Inc. v Capano & Sons, 394 F Supp 146, 154 [DC Del]). Here the parties did reach a different agreement: the commission was not to be earned until the money was taken down, until title to the funds actually passed. That would be the entire agreement if the "willful default” language had not been adopted. Instead, the parties inserted that term to establish a point in the transaction when the borrower could not willfully refuse to proceed without being obligated to pay the broker. Upon signing the commitment letter, paying the consideration, and locking in the right to borrow, Atrium obligated itself to pay the broker if it closed or if it willfully refused to close. Any other interpretation of the contract would render the "willful default” language utterly meaningless.
In Graff, the "willful default” language of the agreement was strictly construed against the broker/drafter, and summary judgment awarded to the seller. Here, where Atrium— not the broker — drafted the loan brokerage agreement, there is no reason again to read the "willful default” language strictly against the broker. As Graff is now even further extended beyond real estate agreements to loan commitments, this Court’s message is plain: brokers should know that commission agreements will be read very strictly against them, whether or not they are the drafters. This is a message to be heeded at the time of contracting, if they are to have any hope of enforcing their bargains and collecting their commissions.
I would affirm the Appellate Division order granting summary judgment to the broker. As both the trial court and Appellate Division concluded, clearly this broker earned its commission.
Chief Judge Wachtler and Judges Simons and Hancock, Jr., concur with Judge Bellacosa; Judge Kaye dissents and votes to affirm in a separate opinion in which Judges Alexander and Titone concur.
Order reversed, etc.