OLIVER B. CANNON AND SON, INC., a
Pennsylvania Corporation, Plaintiff,

v.

FIDELITY AND CASUALTY COMPANY
OF NEW YORK, a New Hampshire
Corporation, Defendant.

Civ. A. No. 79–129.

United States District Court,
D. Delaware.

Jan. 16, 1980.

As Amended on Denial of Motion for
Reargument Jan. 16, 1980.

Courtney H. Cummings, Jr., Wilmington, Del., for plaintiff.

B. Wilson Redfearn and Colin M. Shalk of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for defendant.

## OPINION

LATCHUM, Chief Judge.

Plaintiff in this action, Oliver B. Cannon and Son, Inc. ("Cannon"), seeks to recover from its insurance carrier, defendant, Fidelity and Casualty Company of New York ("insurer"), sums of money which it allegedly became obligated to pay as damages as the result of a lengthy court battle in the Delaware state courts. Plaintiff also seeks compensation for the costs and expenses of defending those actions as well as exemplary damages. Currently before the Court are plaintiff's motion for summary judgment and defendant's motions for summary judgment and partial summary judgment.

### I. *The Facts*

In order to understand the present action, it is necessary first to describe the events leading up to and involved in the State court litigation and the results of that litigation. Those events are described and reported in three opinions of the Delaware Supreme Court.[1] The following facts are taken from those opinions unless otherwise noted.

Cannon is a Pennsylvania corporation domiciled in Philadelphia, Pennsylvania. In 1969, Dorr-Oliver, Inc. ("Dorr"), a general contractor, engaged Cannon as a subcontractor to prepare and paint the interior

---

1. The three opinions, all entitled *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* appear at 312 A.2d 322 (Del.Supr.1973); 336 A.2d 211 (Del.Supr.1975); and 394 A.2d 1160 (Del.Supr. 1978).

linings of certain chemical process tanks. Those tanks were part of a plant for the production of magnesium hydroxide paste which Dorr was constructing for Barcroft Company ("Barcroft") at Lewes, Delaware. Cannon's task under its contract was both to prepare the surfaces of the tanks by removing all rust and foreign materials and to apply linings composed of a polyester resin. Cannon performed this task negligently. The Delaware Superior Court found that it had been guilty of a "multitude of sins" both in the preparation of the surfaces and the application of the lining materials. As a result of Cannon's poor workmanship, the tank linings began to deteriorate almost immediately. Within half a year, Barcroft was forced to close its plant because the linings of several tanks were peeling off in large sheets and the tanks, themselves, were rusting.

Upon requests from Barcroft and Dorr, Cannon performed repair work on all tanks and, in the course of that work, was paid $94,306.34 in inducement money by Barcroft through Dorr. Upon the failure of Dorr and Barcroft to pay an additional $113,914.23, Cannon, through its privately retained attorney, filed suit against them in Delaware Superior Court. The suit was filed in January, 1971.[2]

Barcroft and Dorr both responded to Cannon's suit by filing counterclaims against Cannon. Barcroft demanded the return of the $94,306.34 in inducement money and also compensation for lost profits. Dorr sought compensation for its own expenses incurred in connection with the repair operations.

The trial was bifurcated. In the first trial, the trial court found partially against Cannon on the issue of liability. On appeal of that decision, the Delaware Supreme Court held that Cannon was entirely at fault for all damages and returned the action to the trial court for a second trial on the issue of damages. Ultimately, after several rounds of appeals, Cannon was held liable to Dorr for $48,324.06 and to Barcroft in the amount of $131,344.94 for the inducement money and expenses. The total amount of liability for lost profits is apparently still being litigated in the state courts.

Defendant had issued two insurance policies to Cannon which are involved in this litigation. One provided comprehensive general liability insurance and included coverage for contractual liability and personal injury liability ("the general liability policy").[3] The second was a broad form excess policy ("the excess policy") which provided insurance for any loss in excess of the underlying general liability or any loss not covered by that policy in excess of $10,000.[4] Cannon had fulfilled all conditions precedent, insofar as all premiums had been paid on the policies and the contract with Dorr had been reported to the insurance company.[5] Hence, the policies were in full effect and their coverage extended to liability arising out of the Dorr contract.

Cannon notified the defendant that it expected Dorr and Barcroft to file claims against it as early as December 1, 1970. This was before Cannon had even filed its own suit. Arthur P. McDonald, Cannon's Vice-President and Treasurer, kept the defendant apprised of all new developments in the litigation. In a letter dated June 15, 1971, he formally notified the defendant of the counterclaims and requested that it defend against them. This formal request followed numerous oral requests.[6]

The insurer's attitude regarding its obligation to defend against those claims can be described, at best, as one of ambivalence.

---

2. Docket Item ("D.I.") 51, ¶ 1.

3. Policy No. L 157 81 12, D.I. 26, Appendix N.

4. Policy No. LX 633 22 15, D.I. 26, Appendix O.

5. Admission 1, D.I. 30; D.I. 50, ¶ 5; the policy required that contracts be reported before the general liability policy could become effective.

6. D.I. 50, ¶¶ 2, 3.

Although the facts are not clear on the record, an inference could be drawn that the insurer did not make a good faith effort to meet its obligations under the contract, but, rather, in bad faith, tried to avoid them. At the very least, the record reveals a confusion on the part of the insurer so profound as to vitiate its ability to defend Cannon during the first several years of the underlying litigation. The defendant's posture certainly necessitated the hiring of a private attorney to represent Cannon, in, at the very least, the first several years of the litigation.

For purposes of discussing the claims regarding coverage, the claims in the underlying litigation can be put into two classes—the claims against Cannon for lost profits ("the lost profits claims") and the claims which related to costs incurred for the purpose of repairing the damaged tank linings ("the repair claims"). The insurer had a great deal of difficulty in resolving internally the question of whether either of those two categories of claims were covered. At an early point, the insurer consulted outside counsel, the firm of Wilson and Russell, and received an opinion from them indicating that the repair claims were covered but that the lost profits claims were excluded.[7] The insurer's home office ultimately took the opposite point of view, and, in a letter dated July 18, 1972, informed Cannon that it would provide coverage for the lost profits claim but maintained that certain exclusions applied to the repair claims.[8] Although the insurer adhered to the latter position from that point forward, the fact that it took over a year and a half to reach that decision raises an inference of a bad faith attempt to use dilatory tactics to avoid contractual obligations.

The July 18, 1972 letter itself contains another statement which could also be considered an indicia of bad faith. The insurer there reported that since its investigation had shown that the contract with Dorr had not been reported, and premium had not been paid, there could be no coverage under the general liability policy. That contention was totally unfounded in fact and the insurer has apparently abandoned that position.[9]

The nature of the insurer's investigation of Cannon's claims further indicates some lack of good faith. For nearly two years after being notified of the counterclaims,[10] the insurer limited its investigation to a review of the contractual documents.[11] The insurer refused to investigate the claims of negligence by interviewing Cannon's employees or potential witnesses, or by investigating the site.[12]

The ambivalent attitude of the insurer is further evidenced by its attempts to secure a non-waiver agreement. Because of its own uncertainty regarding the scope of the coverage, the insurer was unwilling to undertake Cannon's defense of the counterclaims without some form of non-waiver agreement. Consequently, on July 20, 1971, such an agreement was submitted to Cannon. In fact, this agreement would have constituted a complete waiver on the part of Cannon of coverage for the repair claims.[13] Cannon's attorney wisely advised his client not to sign that document.[14] Consequently, the insurer's attorneys did not participate at all in the litigation until a

7. D.I. 49, Exhibit A(h).

8. D.I. 1, Exhibit B.

9. D.I. 50, ¶ 4, Exhibit F–2.

10. D.I. 50, Exhibit E.

11. The period of time preceding the execution of the non-waiver agreements discussed *infra*.

12. D.I. 16, ¶ 5.

13. D.I. 50, ¶ 3.

14. D.I. 50, ¶ 4, Exhibit F–2.

suitable non-waiver form was executed on October 11, 1972.[15]

The consequence of that delay was that the insurer's attorneys were able to contribute but little to the preparation for the trial determining liability. By the time that the non-waiver form was executed, Cannon's motion for summary judgment was before the state courts and the insurer decided to forego an extensive investigation and review of the case until a decision came down on the summary judgment motion.[16] That decision was rendered on September 18, 1973, just one month prior to the pre-trial conference.[17] Thus, most of the work on the issue of liability by necessity was performed by Cannon's private attorney. The issues of liability involved in the repair claim were substantially the same as those involved in the lost profits claim.

There exists a dispute of facts as to the extent of the insurer's commitment to defend Cannon even after its attorneys began their participation. Cannon maintained, at oral argument, that it was not dissatisfied with the performance of the insurer's attorneys, the firm of Wilson and Russell. However, Cannon does contend that, throughout the litigation, the insurer was more interested in limiting its own liability than in defending Cannon on the counterclaims.

As mentioned earlier, the insurer entered into the defense immediately prior to the initial trial (the trial on liability). Because of the insurer's limited participation in the preparation of the trial, its participation in the trial itself was correspondingly limited.[18] The insurer did participate in the appeal, but the extent of its participation is disputed. There is evidence in the record, that the insurer limited its participation to the "lost profits" claim and apparently left the task of defending allegations of negligence and breach of warranty to plaintiff's private attorney.[19] On the other hand, there is also evidence indicating that the insurer undertook a "complete defense of the counterclaims" following the execution of the non-waiver agreement.[20]

Cannon further contends that even when the insurer's attorneys did participate in Cannon's defense, they were, by the company's instructions, primarily interested in furthering the insurance company's interests, often at Cannon's expense. Indeed, a letter written late in 1975 by Wilson and Russell to the insurer indicates that they may have been more interested in establishing that the grounds for recovery against Cannon were not within the coverage of the insurance contract than they were in defending Cannon.[21] The letter seems to indicate that the conflict of interest existed during the prosecution of the appeal of the liability issues and was continuing in the damages portion of the trial. Cannon takes the position that, because of the conflict of interest evidenced by this letter, the insurer's counsel did not effectively represent Cannon at any stage of the litigation.

Thus, the record contains many indicia of possible bad faith on the part of the insurer. It also shows a complete failure to defend Cannon in the early stages of the underlying litigation and a dispute of facts as to the extent, sincerity, and effectiveness of its defense in the later stages.

Judgment became final as to the repair claims with the issuance of the Delaware Supreme Court's opinion on November 1, 1978, and the latest judgment of the Dela-

---

15. D.I. 50, ¶ 4.

16. D.I. 13, Exhibit J.

17. D.I. 49, Exhibit A(*o*).

18. D.I. 51, Exhibits A, B, C, and E.

19. D.I. 41, pp. 30–31, 38; D.I. 51; D.I. 38, pp. 3–9; D.I. 51, Exhibit P, pp. 3–4.

20. D.I. 43, ¶¶ 2, 3, and 4; D.I. 38, p. 6.

21. D.I. 51, Exhibit G.

ware Superior Court on the lost profits claim came down on August 23, 1979.[22]

This action was filed March 12, 1979.[23] The complaint includes five counts. In Count One, the plaintiff demands $311,375, the amount reflecting both the value of the repairs Cannon made upon the reaction tanks and the interest thereon. Count Two demands $54,223, the amount reflecting Cannon's liability plus interest to Dorr for the sums of money that Dorr had been forced to expend in connection with "paint-lining problems." Count Three demands $89,150.74, the amount reflecting legal fees, court costs, and interest on those expenses through November 1, 1978. In Count Four, the plaintiff seeks punitive or exemplary damages for the insurer's bad faith failure to investigate Cannon's claims, its failure to defend the counterclaims, and its denial of coverage. There, plaintiff demands $801,-543 or some amount equal or not disproportionate to the compensatory damages. In Count Five, plaintiff demands payment for all the damages awarded by the Delaware state courts and an additional amount of $346,794.26, that amount representing counsel fees which plaintiff incurred in the underlying litigation but has not yet paid. These amounts are demanded as compensation for the damages suffered by the plaintiff as a result of defendant's wrongful refusal to represent the plaintiff on any issue other than the determination of damages for the lost profits claim. Finally, plaintiff seeks a declaratory judgment that the defendant will be liable for any additional damages or litigation expenses incurred in the underlying action in the Delaware state courts.[24]

Plaintiff has moved for summary judgment on all counts.[25] Defendant has also moved for summary judgment on its first affirmative defense raising the statute of limitation.[26] Defendant also has moved for partial summary judgment on the question of coverage for the repair and replacement of plaintiff's work or product and the issue of punitive damages.[27] Consideration of the statute of limitations will be deferred until last.

## II. The Claims For Expenses Related To Repairs On The Tanks

Counts One and Two can be considered together since both seek to recover liability and expenses incurred by Cannon that are directly related to the repair of the damaged paint linings.[28] The parties seem to be in agreement that the basic terms of the insurance policies would cover these items and there is no doubt that they do. The conflict arises out of the interpretation of

22. There is nothing in the record to indicate whether this is the final resolution of the issues in the state courts or whether the judgment is on appeal. From the relief plaintiff is seeking, the Court infers that it is on appeal.

23. An amended complaint taking account of changes in damages resulting from the opinion referred to in footnote 22 was approved by this Court on October 24, 1979. (D.I. 52).

24. Since the insurer has admitted coverage of the liability based upon Barcroft's lost profits, that amount is not at issue in this litigation.

25. D.I. 11.

26. D.I. 18.

27. D.I. 44.

28. These claims include both the damages assessed by the state courts against Cannon and the additional money to which Cannon claimed it was entitled for the repair work but failed to recover in the state court litigation. Despite the insurer's implication, the mere fact that some of the damages were uncollected claims in the state case makes no difference. They were uncollectible only because Cannon was found liable for the costs of the repairs. If another party had been employed or Cannon had been paid in full initially, all amounts would have been incorporated in the sum of damages the courts finally assessed.

Similarly, the fact that Cannon has made no demand upon the insurance company for these amounts makes no difference. The company had made a final determination to deny coverage even before Cannon ever discovered it would be unable to recover these amounts from Dorr and Barcroft. To have demanded the total amount later would have been futile.

certain exclusions. The defendant maintains that exclusions (*l*) and (m) in the general liability policy (designated as exclusions (i) and (j) in the contractual coverage portion of the policy) and exclusion (b) in the excess policy would exclude any coverage for the type of liability for repairs and expenses contained in Counts One and Two. Exclusions (*l*) and (m) provide that the general liability insurance does not apply:

(*l*) to property damage to the named insured's products arising out of such products or any part of such products;

(m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of material, parts or equipment furnished in connection therewith; . . . . (underlining indicates bold print)

Exclusion (b) provides that the excess policy does not apply

to injury to or destruction of . . . (2) any goods, products, or containers thereof manufactured, sold, handled · or distributed, or work completed by or for the insured, out of which the occurrence arises.

Thus, the Court is presented with a question of contract interpretation.

The Court of Appeals for the Third Circuit, applying Pennsylvania law,[29] had occasion to interpret an exclusion essentially identical to the ones at issue here[30] in *Pittsburgh Bridge & Iron Works v. Liberty Mutual Insurance Co.*, 444 F.2d 1286 (C.A.3,

1971). In that case, the insured was a subcontractor who had been sued because part of some equipment which it had manufactured had proven to be defective and had damaged other separate and distinguishable parts of the same equipment. The insurer claimed that it was not obligated to defend or to reimburse the insured against any liability incurred as a result of this "occurrence," arguing that coverage was excluded by the work product exclusion. The District Court found the exclusion applicable but the Circuit Court reversed, finding the exclusion to be partially applicable. In holding that the exclusion did not exclude all damages, the court first summarized the innumerable cases which had, in the past, dealt with the work product exclusion:

The applicability of exclusion (h)(4), [the work product exclusion] or exclusions substantially identical to it, has generally arisen in two kinds of factual situations, to wit:

(1) Where X supplies a part to Y who constructs an entity from X's part and from other parts and X's part proves defective causing damage to the entity;

(2) Where X himself constructs an entity from his own parts or others' parts and

(a) a part of the entity is defective and causes damages to someone or something other than the entity, or

(b) a part of the entity is defective and causes damages to the entity itself.

· In situations (1) and 2(a) it is clear, and the cases are uniform, that the (h)(4)

**29.** For the purposes of the present case, all matters of contract interpretation must be governed by Pennsylvania law. Since this Court is sitting in Delaware, Delaware conflicts law must be applied. In Delaware, the validity, construction, and operation of contracts are all governed by the law of the place where the contract was made. *Wilmington Trust Co. v. Pennsylvania Co.*, 40 Del.Ch. 1, 172 A.2d 63 (1961); *Hill v. Hill*, 262 A.2d 661 (Del.Ch.), aff'd, 269 A.2d 212 (Del.Supr.1970); *Pauley Petroleum, Inc. v. Continental Oil Co.*, 43 Del.Ch. 366, 231 A.2d 450 (1967), aff'd, 239 A.2d 629 (Del.Supr.1968); *Norse Petroleum A/S v. LVO International, Inc.*, 389 A.2d 771 (Del.Super. 1978). It is undisputed that the insurance con-

tract involved in the present case was made in Pennsylvania, at the plaintiff's place of business.

**30.** The exclusion in that case was, in fact, identical to exclusion (b) in the present case. Moreover, from the court's discussion there and the cases cited, it is evident that it treated exclusion (b) as identical to exclusions (*l*) and (m) collectively. Indeed, on their face, (*l*) and (m) would seem to apply to the same situations as does (b). Hence, this Court will consider the exclusions of the two policies identical and will refer to them as "the work product exclusion."

exclusion is inapplicable, and that there is coverage and the insurer must defend any suit brought by the injured party against X. *Hauenstein v. St. Paul Mercury Indemnity Co.*, 242 Minn. 354, 65 N.W.2d 122 (1954); *Dakota Block Co. v. Western Casualty & Surety Co.*, 81 S.D. 213, 132 N.W.2d 826; *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538 (3d Cir. 1960). In the situation presented in (2)(b), which is the one before this Court, the cases have not uniformly resolved the issue.

444 F.2d at 1288. After discussing other cases dealing with situation (2)(b), the court held the exclusion ambiguous when applied to the facts in its case, since it was not clear "whether the exclusion applies only to the part of the entity which caused the damage or to the entity itself which the insured has constructed." Resolving the ambiguity in favor of the insured, the court found that the exclusion applied to the defective part itself, but not to any other property, including other non-defective parts supplied by the insured.[31]

The application of that reasoning would require that one first identify those aspects of the work or product that were defective. Any cost of repairing or replacing those defective parts would be covered by the work product exclusion. If there were other parts of the insured's work which would be singled out as separate entities, the cost of repairing and replacing those separate parts would not be excluded. Likewise, any damages to any work or product not supplied by the insured would not be excluded.

■ In the present case, the fact-finder will not have to determine whether or not Cannon's work can be divided into such separate constituent parts,[32] since apparently all aspects of its work were defective. The state courts found that Cannon had been guilty of a multitude of sins both in the preparation of the surface of the tanks and in the application of the liners. Thus, any costs for preparing the surface (including removing any foreign material, such as old liner or rust), applying the liner, or supplying materials, for the purposes of repairing or replacing the defective paint liners would fall within the ambit of the exclusion.[33] However, damages to the tanks themselves or damages to other parts of the plant or its operations would not fall within the exclusion.

■ Although there may be sufficient facts on the record to determine the extent

---

31. *See also, S. L. Rowland Construction Co. v. St. Paul Fire & Marine Ins. Co.*, 72 Wash.2d 682, 434 P.2d 725 (1967) (followed by Third Circuit in *Pittsburgh Bridge & Iron Works*); *contra Biebel Bros., Inc. v. United States Fidelity & Guaranty Co.*, 522 F.2d 1207 (C.A.8, 1975); *Hartford Accident & Indemnity Co. v. Olson Bros., Inc.*, 188 N.W.2d 699 (Neb.Supr.1971).

32. The work on the lining of one tank would undoubtedly be a separate product from the lining on another tank. Thus, if one lining failed and somehow caused the lining of the second tank to fail, the costs of repair and replacement of the linings of the second tank would not be excluded. The real problem in determining whether or not there are separate parts is presented by the question of how one would treat a case where the preparation of the surface of the tank was defective but the application of the lining was proper. The question of whether application is a distinguishable part of the work product from surface preparation will not have to be resolved here because of the

fact that all of Cannon's work was determined by the state courts to be defective.

33. Plaintiff argues that it should only be obligated to pay the cost of the paint and that all other expenses should be covered by the insurance. It thus tries to bring itself into the line of cases represented by *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co.*, 281 F.2d 538 (C.A.3, 1960); *Carboline Co. v. Home Indemnity Co.*, 522 F.2d 363 (C.A.7, 1975), and *Hauenstein v. St. Paul-Mercury Indemnity Co.*, 242 Minn. 354, 65 N.W.2d 122 (1954). Those cases, however, all involved paint manufacturers whose product was applied by third parties. It could not be said that the application was their work or product. Here, however, the preparation and application were the plaintiff's product. Indeed, the paint itself was found not to be defective, only the application. Hence, the holdings of those cases that the exclusion would cover only the cost of the paint are wholly inapplicable here.

of coverage of the damages alleged in Counts One and Two, summary judgment is inappropriate at this time because there exists a question of fact as to whether the insurer may invoke the exclusions at all against Cannon. This is so because under Pennsylvania law, in order to invoke the application of an exclusion, the insurer must first prove that at the time the insurance contract was made, the insured knew of the exclusion and understood its meaning, and thus intended to be bound by it. *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Super. 511, 327 A.2d 363 (1974).[34] The reasoning behind this rule is sound. An insurance contract is written by the insurer and at the time the insurer signs the contract, he is primarily interested in monetary matters such as the amount of coverage, the broad areas of coverage and the premiums. Concern over definitional clauses and exclusions is minimal. Hence, if such clauses become material, they are strictly construed against the insurer and must be raised by the insurer as an affirmative defense. In order to establish such an affirmative defense, the insurer must prove that the insured was aware of the exclusion and that it had been explained to him. *Hionis v. Northern Mutual Insurance Co.*, *Id.* at 365–366.[35] The parties have neither argued this issue nor presented evidence

**34.** Although the Pennsylvania Court discussed the requirement in terms of the burden of proof which must be met by the insurer invoking the exclusion, it is clear that the issue is really one of contract interpretation and validity, and hence is governed by Pennsylvania law. The insurer must show knowledge and understanding on the part of the insured in order to establish that the exclusion was part of the contract—that the insured intended to be bound by it. This requirement follows from the fact that Pennsylvania considers insurance contracts to be contracts of adhesion and, hence, the usual presumption of validity will not attach to terms favorable to the party in the superior bargaining position. Instead, the party must show that the insured did, in fact, intend to be bound.

**35.** The *Hionis* requirements are particularly appropriate in the present situation. The exclusions section, while not ambiguous to one trained in law, is at best confusing. Indeed, Cannon has argued that the existence of exclusion (a) in the general liability policy creates an ambiguity with the work products exclusions which should be resolved so as to give coverage. Exclusion (a) provides that the insurance shall not apply

. to liability assumed by the Insured under any contract or agreement except an incidental contract; but this exclusion does not apply to
· a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

. · . . .

Cannon argues that exclusion (a) expressly provides that damages arising out of a warranty of fitness or quality of the insured's products shall not be excluded and that this *proviso* creates an ambiguity when read beside exclusions (*l*) and (m) which seem to exclude just such categories of liability. (Of course, such an ambiguity would not arise at all in either the contractual liability portion of the general liability policy or in the excess policy, since neither contains exclusion (a).) Consequently, applying the rule that all ambiguities should be resolved against the insurer, Cannon argues that the exclusions should not apply here. While exclusion (a) would most probably create an ambiguity to one untrained in law, this Court does not find it legally ambiguous. The *proviso* that the exclusion will not apply to damages arising out of breach of warranty is clearly limited to "this exclusion," meaning exclusion (a). This may raise the question of why the *proviso* should be included at all if the insurer wanted to exclude those types of liability in any case. The question can be readily answered upon consideration of the types of liability covered by exclusions (*l*) and (m) and the *proviso* to (a). Exclusion (a) is obviously intended to exclude liability assumed under a contract but is not meant to exclude the types of liability subsumed under the category "products liability." This is the reason for the *proviso* to (a). This *proviso* is thus much broader than the exclusions in (*l*) and (m) which apply only to exclude the costs of replacing the insured's own defective products or parts of products. While the insurance company could have lessened the ambiguity by strictly defining contractual liability in the definitions section and then leaving the *proviso* out of exclusion (a), the exclusions are not ambiguous to one trained in law in their present form. See, *Aetna Insurance Co. v. Pete Wilson Roofing & Heating Co., Inc.*, 289 Ala. 719, 272 So.2d 232 (1972) (where a definition of contractual liability excluding products liability was included in the definitional section. *Held*, no ambiguity.) Although this Court does not find the contract ambiguous, *per se*, it does find it ambiguous to one untrained in law. Hence, if the standard of ambiguity in Pennsylvania were ambiguity to

concerning it. Hence, summary judgment on Counts One and Two is inappropriate at this time.

### III. *Attorney's Fees*

■ It also appears that summary judgment is inappropriate on both Count Three of the complaint, in which Cannon seeks an award covering its already paid expenses for attorney's fees and litigation costs, and on that part of Count Five in which the plaintiff seeks the $346,794.26 which it owes but has not yet paid for services rendered by its privately retained attorney in the state court litigation. Although it is clear to this Court that the insurance company has breached its duty to defend Cannon, there exists a dispute of fact regarding the extent of the breach, and, hence, the extent of the damages.

■ The duty to defend under Pennsylvania law is very broad, often extending well beyond the duty to indemnify. There may even be an obligation to defend although there is no obligation to indemnify. *Moffat v. Metropolitan Casualty Insurance Co. of New York*, 238 F.Supp. 165 (M.D.Pa. 1964). Pennsylvania courts have held innumerable times that where the insurance contract obligates the insurer to defend the insured against some of the claims in a complaint, the insurer must also defend against other claims of the complaint which do not fall within the coverage of the policy until the litigation reaches the point where it would be impossible to recover on any of the claims falling within the coverage of the policy. *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A.2d 484 (1959); *Seaboard Industries, Inc. v. Monaco*, 258 Pa.Super. 170, 392 A.2d 738 (1978); *Bituminous Ins. v. Pa. Manufacturers' Association Ins. Co.*, 427 F.Supp. 539, (E.D.Pa. 1976). *See also, Lee v. Aetna Casualty & Surety Company*, 178 F.2d 750 (C.A.2, 1949).

■ In order to determine whether the duty to defend exists, one must examine the complaint (or counterclaim in this case). If the complaint states a cause of action that may even "potentially" become one within the scope of the policy, the duty to defend attaches and is not removed until it is clear that there could be no coverage under the policy. *Cadwallader v. New Amsterdam Casualty Co., supra*, at 488; *Moffat v. Metropolitan Casualty Co. of New York, supra*, at 174–175. If the insurance company should make an initial decision not to assume the defense of the insured, it does so at its own risk and must answer in damages if its determination later turns out to be erroneous. *Cadwallader v. New Amsterdam Casualty Co., supra*, at 488.

■ Finally, when it is representing the insured, the insurer owes it an implied contractual duty to discharge its duty with the utmost good faith. Pennsylvania law imposes on the insurer the duties of a fidu-

the layman, as is the standard in Arizona, this Court would be compelled to find the exclusions (*l*) and (m) inapplicable as a matter of law, as did the Arizona Supreme Court in construing identical exclusions in *Federal Insurance Company v. P.A.T. Homes, Inc.*, 113 Ariz. 136, 547 P.2d 1050 (1976). While no Pennsylvania decisions indicate whether "ambiguity" means lay or legal ambiguity, this Court believes that the Pennsylvania requirement that the contract be explained to the insured will adequately protect the consumer so as to vitiate the need to adopt the layman standard.

The *Hionis* requirement also appears particularly *apropos* in the present case, in light of the facts that all parties involved had difficulty in determining the exact meanings of the exclusions and that the insurer's own outside counsel, at one point, found that coverage was not excluded. The *Hionis* requirements were adopted, among other reasons, to prevent insurance companies from extracting obscurely written provisions from Byzantine contracts for the purpose of defeating the legitimate expectations of their policy holders.

The obscurity of the present exclusions, the marginal ambiguity, the confusion of all parties, including those trained in law, and the lack of any showing of meaningful bargaining at the time the contract was formed, all combine to distinguish this case from that of *Brokers Title Company, Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174 (C.A.3, 1979), where the Third Circuit found the *Hionis* requirements inapplicable.

ciary. *Gray v. Nationwide Mutual Insurance Co.*, 422 Pa. 500, 223 A.2d 8 (1966); *Diamon v. Penn Mutual Fire Ins. Co.*, 247 Pa.Super. 534, 372 A.2d 1218 (Pa.Super. 1977). Thus, all potential conflicts of interest must be assiduously avoided. *Bituminous Ins. v. Pa. Manufacturers' Association Ins. Co., supra,* at 555.

■ If the insurance company breaches its contractual duty to defend, the normal rule of damages for breach of contract applies and the insurer will be liable to the insured for all damages directly resulting from the refusal to defend. *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of New York*, 281 F.2d 538 (C.A.3, 1960).[36]

Cannon's claims must be judged in light of these principles of law. The insurer was undoubtedly in breach of its duty to defend up until the time it took full control of the litigation. Although it initially declined to defend because of a lack of a non-waiver agreement, it did so at its own risk. The question of when, if ever, the insurer did take full control of, and responsibility for, the litigation is not clear on the record. The facts are disputed. First, it appears that the insurer's attorneys left a great deal of the work to Cannon's attorney in the initial stages because of the latter's familiarity with the issues and the extent of the work that he had already completed. It is not clear when they took over. Secondly, the record does not resolve the question of whether the insurer ever assumed responsibility for the entire defense. Since, at the very least, it was obligated to defend the lost profits claim, the insurer had to maintain the entire defense. Indeed, given the fact that many of the facts and issues necessary to establish Cannon's claim for monies owed it for effecting repairs were identical to those necessary to defend against all the counterclaims, the insurer was responsible for conducting practically the entire litigation.[37] Consequently, the insurer would be obligated to pay Cannon any reasonable fees which Cannon incurred as a result of the insurer's failure to undertake any part of the defense of the counterclaims. Finally, there are disputed issues of fact relating to the question, even if the insurer undertook the entire defense, whether it conducted that defense in good faith. If it did not, it would be liable to Cannon for reasonable fees incurred in protecting itself by hiring an attorney without a conflict of interest. Since there are multiple disputed fact questions, summary judgment is now inappropriate on Count Three, and those parts of Count Five relating to attorney's fees.

## IV. *Damages For Failure To Act In Good Faith*

■ In Count Five the plaintiff seeks compensatory damages for the defendant's alleged failure to deal with, and represent, plaintiff in good faith. Under Pennsylvania law, an insurer may be liable for the entire amount of a judgment secured by a third party against the insured, regardless of any limitation in the policy, if the insurer's handling of the claim was done in such a manner as to evidence bad faith on the part of the insurer in the discharge of its

---

**36.** In *Pittsburgh Plate Glass*, the Third Circuit was applying Pennsylvania law. Because there was no law in Pennsylvania state decisions on that particular issue, the court applied general contract law. In the present case, Delaware law must govern the law of the breach. Delaware conflicts law provides that claims for breach of contract are governed by the law of the state where the contract was to be performed. *Dubin Weston, Inc. v. Louis Capano & Sons, Inc.*, 394 F.Supp. 146, 153 (D.Del.1975). The contract to defend here was to be performed in Delaware. However, since both Pennsylvania and Delaware follow general common law principles of contract law and this Court has neither found nor been cited any Delaware authority on this issue, *Pittsburgh Plate Glass* is controlling.

**37.** Of course, the insurer would not be obligated to represent Cannon in those parts of the litigation which related *solely* to the claims which Cannon was prosecuting. For example, it would not be obligated to assume any responsibilities to prove the damages to which Cannon would have been entitled had it prevailed upon the claims of its complaint.

contractual duty. *Gray v. Nationwide Mutual Insurance Company, supra; Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (Pa.Supr.1957); *Diamon v. Penn Mutual Fire Ins. Co., supra.* Plaintiff seeks compensation for all damages awarded by the state courts—attorney's fees, court costs and interest.[38]

▮ Only plaintiff has moved for summary judgment on this Count. This Court, in the preceding Section, has already denied summary judgment on that part of Count Five reflecting the amounts plaintiff presently owes to the attorney who represented it in the state court litigation. Plaintiff's motion must be denied as to other parts of Count Five as well. As noted above, many of the insurer's other actions could be attributed as well to incompetence as to bad faith. Indeed, as this Court has noted before, summary judgment is almost never warranted in cases involving issues of motive or intent. *Patton v. Conrad Area School District*, 388 F.Supp. 410, 418 (D.Del. 1975); *West v. Wheatley*, 313 F.Supp. 656, 659–60 (D.Del.1970).

## V. *Punitive Damages*

Finally, in Count Four, plaintiff seeks punitive damages for defendant's failure to exercise good faith in dealing with the counterclaim against it. Defendant has moved for summary judgment on the grounds that punitive damages may not be awarded for breach of contract.

▮ It is the general rule in Delaware,[39] as elsewhere, that exemplary damages usually cannot be obtained for breach of contract. *Nash v. Hoopes*, 332 A.2d 411 (Del. Super.1975); *J. J. White, Inc. v. Metropolitan Merchandise Mart, Inc.*, 9 Terry 526, 107 A.2d 892 (1954); *Stephens v. Melson*, 426 F.Supp. 1022 (D.Del.1977). However, this is only the general rule and there are exceptions. Thus, several opinions have implicitly recognized that punitive damages may be awarded in cases where the breach of contract is very similar to a tort. *Nash v. Hoopes, supra*, at 414; *Stephens v. Melson, supra.* Corbin is in accord. 5 Corbin on Contracts § 1077 (1964). Indeed, a large and growing number of states have found that under certain extraordinary circumstances, punitive damages could be awarded for breach of an insurance policy, *Fletcher v. Western National Life Ins. Co.*, 10 Cal. App.3d 376, 89 Cal.Rptr. 78, 47 A.L.R.3d 286 (Cal.App.1970) being the leading case in the area. These cases have reasoned that because the insurer owes a strict duty of good faith in its dealings with the insured and because this duty has been likened to a fiduciary duty, a breach of that duty approximates a tort.[40]

▮ Although punitive damages may be proper in some cases, in order to allow an award, the plaintiff must show the type of behavior which would warrant punitive damages in an ordinary tort case. In this, he carries an extraordinary burden. Puni-

---

38. From an examination of plaintiff's complaint, it is readily apparent that plaintiff seeks an award of all these damages in addition to any awards under Counts One, Two and Three. Since Count Five seeks compensatory damages only, plaintiff may not recover, under Count Five, any damages for which it may be compensated under Counts One, Two and Three. The plaintiff may only recover those damages not sought or those not recovered under the first three counts.

39. Both parties have seemed to argue on the assumption that Pennsylvania law applies here. However, since the issue of punitive damages is an issue involved in the law of breach, Delaware law applies. *See,* footnote 30, *supra.*

40. *See, Wetherbee v. United Ins. Co.*, 265 Cal. App.2d 921, 71 Cal.Rptr. 764 (1968); *State ex rel. Larson v. District Court of Eighth Judicial District*, 149 Mont. 131, 423 P.2d 598 (1967); *Hodge v. Cimmaron Ins. Co.*, 338 F.Supp. 910 (E.D.Mo.1972) (right to punitive damages apparently recognized, but recovery denied on facts); *State Farm General Ins. Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974); *Diamond v. Mutual Life Ins. Co.*, 77 Misc.2d 528, 356 N.Y. S.2d 164 (1974); *Kirk v. Safeco Ins. Co.*, 28 Ohio Misc. 44, 273 N.E.2d 919 (1970); *Dawkins v. National Liberty Life Ins. Co.*, 252 F.Supp. 800 (D.S.C.1966); *Export Ins. Co. v. Herrera*, 426 S.W.2d 895, 900 (Tex.Civ.App.1968).

tive damages are awarded in Delaware not as compensation but as punishment to the wrongdoer for wilful or wanton misconduct. *Riegel v. Aastad*, 272 A.2d 715 (Del.Supr. 1970); *Stephens v. Melson*, 426 F.Supp. 1022 (D.Del.1977). Although, the Delaware courts have not interpreted the meaning of the phrase "wilful or wanton" in the context of the breach of an insurance contract, this Court finds the standard enunciated in *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78, 47 A.L. R.3d 286, 305 (1970) an appropriate one. That court found that in order to warrant punitive damages, the insurer must have acted "maliciously and without probable cause, for the purpose of injuring its insured by depriving him of the benefits of the policy."

This Court strongly doubts that this standard has been met here. However, it also hesitates to take that decision away from the jury. There is evidence in the record from which a jury could infer malice or at least wanton disregard of the rights of the insured. As noted above, on issues such as these, involving state of mind, or motive, summary judgment is rarely warranted. Consequently, both defendant's and plaintiff's motion for summary judgment on Count Four will be denied.

## VI. *Statute Of Limitations*

The defendant has also moved for summary judgment on its affirmative defense that the action is barred by the statute of limitations. It is clear that in this case the Delaware statute of limitations is the applicable one. 10 *Del.C.* § 8106 would be the appropriate Delaware statute. This provision imposes a three year limitation on actions sounding in contract and/or tort in which the injury alleged was "unaccompanied by force or resulting indirectly from the act of the defendant."

 Plaintiff has maintained that the six-year Pennsylvania statute of limitations should apply. This position is clearly

wrong. The breach of contract and tort occurred in Delaware. Thus the cause of action arose in Delaware and the Delaware statute of limitations applies. Even if one took the position that the cause of action arose in Pennsylvania, where the contract was made, the Delaware statute would apply since 10 *Del.C.* § 8121 provides that when a cause of action arises outside of the state, the shorter statute of limitations shall apply.

 The real issue then between the parties here is the question of when the statute began to run. The defendant contends that it began to run for the causes of action stated in Counts One and Two upon the entry of the Superior Court opinion on May 23, 1974, in which Judge Tease found Cannon liable but did not determine damages. It also contends that it began to run for the breach of the duty to defend (Count Three and the attorney's fees portion of Count Five) upon the receipt by plaintiff, on July 18, 1972, of insurer's letter denying coverage. Finally, it argues that the statute began to run on Counts Four and Five upon the performance by the defendant of the first actions evidencing bad faith, on July 18 and 20, 1972. Thus, defendant argues, the three year period had run on all counts by the time this action was filed on March 12, 1979. Plaintiff, on the other hand, takes the position that the statute has not yet begun to run on either the "bad faith" or the failure to defend claims, since the injuries complained of have been continuing ones and continue even today in the state court litigation. It further argues that the statute began to run for the causes of action in Counts One and Two, based on repair related damages, only upon the entry of the Delaware Supreme Court's final judgments dated August 30, 1978 and November 1, 1978, in which the court finally affirmed the damages involved in those two counts. This Court is convinced that plaintiff's position is the proper one.

 The statute itself provides that it shall begin to run upon "the accruing of the

cause of action." In the case of a contract for indemnity against liability, the cause of action accrues and "the statute of limitation begins to run when indemnitor-liability becomes fixed and ascertained or as soon as the debt becomes due." *Sorensen v. Overland Corp.*, 142 F.Supp. 354, 361 (D.Del. 1956), *aff'd*, 242 F.2d 70 (C.A.3, 1957). Liability becomes fixed and ascertained only upon the entry of a final judgment against the indemnitee. *Cosmopolitan Mutual Insurance Co. v. White*, 336 F.Supp. 92, 100 (D.Del.1972); *Moffat v. Metropolitan Casualty Insurance Co. of New York*, 238 F.Supp. 165, 175 (M.D.Pa.1964).

■ For purposes of the damages Cannon seeks in Counts One and Two, final judgment means the time when damages were finally fixed and when Cannon became finally liable to pay them. That date is November 1, 1978, when the Supreme Court denied Cannon's motion for rehearing on its liability for the costs of repairing the tanks. Judge Tease's opinion of 1974 did not fix the amount of liability but determined only the parties that would be liable. Cannon could not have recovered on its contract against the insurer until the actual amount due under the contract was determined. This could not be done until all court proceedings determining damages were completed. Only at that point did Cannon have a final and absolute duty to pay damages and only then could the amount that the insurer owed Cannon under its contracts be determined. The defendant's position could lead to an absurd result in the present case. The amount of the damages changed several times as the results of various appeals in the underlying action. If the defendant's position were

adopted, Cannon might have recovered for damages, for "liability," which it ultimately did not have to pay.

The insurer contends that even though the statute has not run as to the damages awarded by the state courts, it has run as to the amounts of money which Cannon was never paid for its repairs. This loss was final when the Delaware Supreme Court affirmed Judge Tease's opinion finding Cannon liable, and hence, defeating Cannon's own claims against Barcroft and Dorr. This argument is a more difficult one. If Cannon had been paid no advance money and if there were no other damages involved in the action that were inextricable from this "loss," this Court might be convinced that the statute began to run upon the entry of the first Supreme Court judgment. However, that is not the case here. In the present situation, the total amount of "liability" arising out of the single occurrence could not be determined until all damages were finally determined.[41] Hence, because of the unique facts presented by this case, this Court holds that no part of Counts One or Two is barred by the applicable statute of limitations.

■ Cannon's claim for indemnification for legal costs is also not barred. This precise question arose in *Moffat v. Metropolitan Insurance Co. of New York*, 238 F.Supp. 165 (E.D.Pa.1964) where the court held that the statute of limitations did not begin to run on a claim for failure to defend under an insurance contract until the underlying litigation is complete. Although that court applied Pennsylvania law, the principles relied upon are identical to those of Delaware. The court found that there

---

41. Assuming, *arguendo*, that the insurer could invoke the relevant exclusions against Cannon, the amount that the insurer owed Cannon could not be determined until damages were finally fixed. The insurer would be obligated to pay Cannon for any liability incurred because of damages to parts of the plant other than Cannon's defective work product. Some of the repair work may have related to such damages. Because the repair work included work for

which Cannon was not paid, work for which Cannon was paid, and work which Dorr completed, it would be exceedingly difficult, if not impossible, to determine what amounts were due under the policy until all damages became final. The statute of limitations does not begin to run until damages are both fixed and can be "isolated." *Moffat v. Metropolitan Ins. Co. of New York, supra*, at 176.

was a continuing duty to defend and that, hence, there was a continuing contract. In cases of a continuing contract, and a continuing breach, the statute begins to run only when full damages can be determined and recovered. In the context of a contract to defend, this can occur only upon the completion of the litigation. *Id.* at 175–76. Delaware follows the same principles. In the case of a continuing tort, Delaware courts have held that where there is a continuing injury whose damages cannot be determined until the cessation of the wrong, the statute of limitations begins to run no earlier than the last date of that wrong. *Oakes v. Gilday,* 351 A.2d 85 (Del. Super.1976). Furthermore, in *Sorenson v. The Overland Corp.,* 142 F.Supp. 354, 361 (D.Del.1956), *aff'd,* 242 F.2d 70 (C.A.3, 1957), this Court held that the statute of limitations did not begin to run on a claim for indemnification for legal expenses until the last services were rendered by the attorney. Thus, this Court is convinced that the statute of limitations has not run on Count Three and the attorney's fees portion of Count Five.

For similar reasons, defendant's motion must be denied as to Counts Four and Five. Both base their claims on a continuing injury, the defendant's failure to deal in good faith with the plaintiff and its failure to undertake a good faith defense. The damages were not ascertainable under final judgment in 1978, and may still not be ascertainable, since the lost profits claim apparently is still being litigated. Consequently, this Court must conclude that no part of plaintiff's claims is barred by the statute of limitations.

For the foregoing reasons both plaintiff's and defendant's motions for summary judgment will be denied in all respects. An Order will be entered consistent with this Opinion.